ELLIG *et al. v.* NAGLEE AND SHARP, TRUSTEES.

When trustees act with good faith, in the management of the trust property, and without selfish motives, they are entitled to be treated by a Court of Equity with liberality and indulgence, and especially when they act under the advice of counsel.

Very supine negligence, or willful default, will render them liable; but to make them liable for mere errors of judgment, would tend to discourage good and prudent men from undertaking the trust.

Delay, on their part, in bringing suit to recover the rents of the trust estate, if subsequently approved by the *cestui que trusts*, will excuse them.

Money advanced by the trustees to the *cestui que trusts*, with the understanding that the same should be repaid out of the rents of the trust property, is a lien only upon the net incoming rents, and not a lien upon the trust property.

The same is true respecting the charges for legal services of one of the trustees in the management of the trust property. The rents must be applied to the payment of such allowances until they are liquidated.

APPEAL from the District Court of the Fourth Judicial District, County of San Francisco.

This was a suit in equity, to obtain an account from the de-

fendants, as trustees of Mary Ellig and John Ellig, (now deceased,) and also the surrender of the trust estate, and charging the defendants with negligence and mismanagement of the estate, and claiming a judgment for $13,500, rents alleged to have been collected by the trustees, and not paid over, and also praying a restraining order of Court against defendants during litigation, etc.    The facts are as follows:

John Ellig, deceased, about the eighth of March, 1853, intermarried, at San Francisco, with the appellant.    About the same time, but after the marriage, John executed to Mary, directly, and without the intervention of a trustee, by deed bearing date on the eighth of March, 1853, a conveyance for a fifty-vara lot, numbered sixty-three, on the south-west corner of Dupont and Broadway, in San Francisco.    This lot was his separate property, having been acquired before the marriage.    The consideration recited is one dollar, " as well as the consideration of love and affection."

The improvements on the lot, at the time the conveyance was made, were without value, consisting of small wooden shanties.

On the thirteenth of March, 1854, John and Mary joined in a conveyance of this lot to the defendants, " to be held by them, in trust, for the benefit of the said parties of the first part," and under the following provisions: The defendants, as trustees, " to rent and lease the premises in such manner and upon such terms as they think most advantageous.    They shall collect the rents, and after making all proper repairs, expenses, taxes, and assessments, shall hold the residue subject to the order of the said parties of the first part, severally, to be equally divided by said trustees between them; and the separate receipt of the said parties of the first part shall be a full and complete discharge to the said trustees."    The respondents also signed this instrument.    No improvements had been made upon the lot during the period intervening between the execution of these two indentures.

On the twelfth day of May, 1854, the trustees entered into an indenture of lease of the entire lot, conveyed in their names as trustees for John and Mary Ellig, as lessors, with H. E. Brown and Rufus Keyser, as lessees, for a term of ten years.    This indenture reserved a monthly rent, payable in advance, ($750) on the first day of each and every month during the term, with a covenant that in case default should be made in the payment of the rent, or any part thereof, for thirty days after the same should become due, " then the whole of said rent, for the unexpired portion of said term of ten years, shall become due and payable " from the lessees to the lessors.    The lessees also covenanted to pay all taxes and assessments on the property; and that, within four months from the demise, they would commence the erection of three-story brick buildings on the premises, to

be completed within one year, and "that the said premises shall be completely built over with brick buildings" before the first day of January, 1857. Provision is then made for a renewal of the lease, if desired, or an estimate of the value of the improvements at the end of the term. In case there was no renewal, the lessors to pay two-thirds of the estimated value.

This indenture of lease was subsequently ratified by John and Mary Ellig, by an instrument apparently intended as a duplicate, in which all the parties united.

The lessees immediately proceeded to erect the three-story brick buildings. At the date of the first assignment of this lease to Sherman, in November, 1854, they had expended $20,000 in the improvements made up to that date. They eventually expended $35,000 in all.

In November, 1854, the buildings being unfinished, the lessees assigned the lease, as collateral security, among other securities, to Wm. T. Sherman, of the banking-house of Lucas, Turner & Co., for a loan of $5,000, to be applied toward the completion of the buildings. A second loan of $5,000 was obtained from Sherman, to be applied to the buildings, and the assignment treated as security for that also. The date of the second loan is not given, but it was before the fifteenth of March, 1855. On that day Sherman pressed the lessees for payment of the first loan, when Brown, one of them, confessed his inability to pay, and recommended Sherman to secure himself. Sherman then took Brown to find Sherman's counsel, "and got him to fix a proper document," and he then drew a second assignment; and on the fourth of April, following the arranged plan of securing himself, Sherman went with Brown, the managing lessee, through the buildings then occupied, and made the tenants attorn to him. Sherman considered himself liable for the ground-rent from that day, and not before. The defendants fixed his liability for the rent reserved in the demise, from November, 1854, instead of from the fourth of April, 1855.

Then follows a long negotiation, by the defendants, with Sherman as the assignee of the lease, to pay the rent, resulting in an action against him, by them, on the covenant. Sherman claimed $5,000 out of the property, and, as a set-off, acknowledged his liability for the ground-rent, from the fourth of April, 1855, when the tenants attorned.

The defendants demanded payment of him from the date of the first loan and assignment of the lease in November, 1854. Brown and Keyser became insolvent in February, 1855. Many propositions passed between them. A reduction of the rent to $500 per month was rejected by Sherman. This was in June, 1855.

But before the suit was instituted, and on the thirtieth of August, 1855, pending these negotiations, Sherman, under the ad-
44

vice of his attorney, assigned the lease to one Jefferies, a man of doubtful responsibility. Notice was not given to the defendants of this assignment until after it was made. Waddington, a tenant on the premises, collected the rents for Sherman, and deposited the money with Lucas, Turner & Co. Waddington also collected the rents for Jefferies and deposited the money with the same banking-house. Naglee and Sharp, on the eleventh of June, 1856, and after having advised with counsel from time to time respecting the trust property, commenced suit for the whole amount of rent, $85,000, which was determined in December, 1856, against the trustees.

John Ellig was privy to these negotiations and their results. He knew that the suit was commenced for the $85,000, and assented to it. This he did after advising with other parties besides the defendants. He expressed himself "perfectly satisfied with Mr. Sharp and Mr. Naglee, and their management of the trust property." He died on the twenty-second of March, 1856, and left a last will and testament, which has been probated, making his wife, plaintiff, the legatee.

On the twenty-fifth day of October, 1856, the plaintiffs instituted this suit.

The defendants answered, denying the charges in the complaint, and offering to resign the trust. The answer made an exhibit of a detailed statement of the management of the trust fund; and, also, of advances made from time to time by the defendant, Naglee, to John Ellig in his lifetime, and also to Mary, his wife, amounting in the aggregate to $11,090 26; also, setting up an indebtedness on the part of the *cestui que trusts* to the defendant Sharp, for legal services, in the management of the trust property, amounting to $1000, and claiming a lien upon the trust property.

When the case was called up for trial in the Court below, it was, by consent of counsel, referred to a referee, who subsequently reported in favor of the claims of defendants to the whole amount set up in their answer. This report was confirmed without objection. Subsequently, the case came on for trial, and the defendants contended that the matter was closed by the report of the referee. But the Court held that the plaintiff might proceed to establish the allegations of the bill, and witnesses were accordingly introduced.

The Court below, in its decree, after negativing the charges in plaintiff's bill, decreed that the sum of $11,090 26, advances made by defendant Naglee, and the sum of $1000, due defendant Sharp for legal services, was a lien on the trust property, and that the same should be sold to pay the amount.

From which decree the plaintiffs appealed to this Court.

*Charles H. S. Williams* for Appellants.

The defendants were trustees, and, as such, were bound to exercise perfect good faith and fidelity, and ordinary diligence, skill, care, and discretion, in the management of the trust.

When they do so—if loss occurs, they are not liable for it; but, if they are guilty of neglect, or fail in either of these particulars, they are to be held to a strict account, and must themselves make good the loss. This general proposition, it is believed, will not be controverted—at least, it is unnecessary to cite authorities to sustain it.

I propose to briefly examine the evidence in this cause, to see, first, whether a loss has occurred, and what it is, and then, whether the defendants could have prevented it, by the exercise in good faith of ordinary or reasonable care, skill, diligence, and discretion, and to point out some manifest errors of law in the decree or judgment.

1. That there has been a loss, needs no argument. The case shows that not a dollar of rent has been collected, since that due on the first of November, 1854. The amount accruing, according to the lease, to October, 1856, when this suit was commenced, is $16,500. Mrs. Ellig, instead of having these rents as they fell due, to defray her necessary expenses, and accumulate the balance, with its interest, has been compelled to borrow money from Mr. Naglee at two and two and a half per cent. per month, to pay for her food and clothing, for which money and interest Mr. Naglee now has a judgment. If the whole rent reserved is not the proper basis for an estimate of the amount lost, for the reason that the property, if possession had been taken, might not have produced so much in the latter part of the time as $750 per month, still it is proved that after the thirtieth of August, 1855, when Sherman assigned to Jeffries, there was received the net amount of $9000.

2. Could this money have been collected by the exercise of reasonable and ordinary diligence and discretion—leaving out of view, for the present, the suit for $85,000?

In November, 1854, when Sherman informed the trustees that he held the first assignment of the lease only as security for a loan, and was not in possession, nor receiving rents, their remedy and their duty seem to have been plain. Brown & Keyser were able to pay then, and an attachment would have brought the money. They paid Sherman the $5,000 loan, and Sherman testifies that they were solvent, till about the fifteenth of March, 1855. But if they were not able to pay, there was a clear right to enforce the payment, by demanding each month's rent at the proper time, and in the proper manner; and proceeding summarily under the statute, to forfeit the lease, and re-enter. This would have brought the money, for the improvements were nearly completed, and the trustees would have got the benefit of several thousand dollars expended on the premises, or the lessees,

or their assignees, would have paid up.   There was not the least difficulty in collecting the rent up to the time Sherman took possession under the second assignment, April 4th, 1855.

From the fourth of April, Sherman acknowledged himself liable for rent, and offered, and was always willing to pay it.   But the trustees would not receive it, unless he would pay that which accrued before he took possession, for the collection of which they had not taken a step, and for which Sherman clearly was not liable.   So they continued to leave the rent uncollected from that time until the thirtieth of August, 1855, when Sherman, to relieve himself from further continuance of his liability, assigned the lease "to a beggar," and gave the trustees notice of the assignment, and afterwards had nothing to do with the lease or property, directly or indirectly.

3. Is the commencement of the suit for $85,000 against Sherman, on the eleventh of June, 1856, and its prosecution to a defeat, a sufficient answer to the charge of negligence in omitting to take any measures for the collection of the current rents, as they accrued, from November, 1854?   We submit that, instead of being a mitigation, it is an aggravation of the negligence and mismanagement charged.

It is claimed, and seriously insisted, that on the eleventh day of June, 1856, they filed their complaint, and commenced their suit in the Twelfth District Court, claiming to recover $85,000 for the whole remaining term against William T. Sherman, who had assigned the lease, and divested himself of all connection with the estate on the thirtieth of August, 1855, more than nine months before the complaint was filed ; and who testifies that he had been always ready and willing to pay the rent from the time he took possession till he parted with all interest in the lease, and always so avowed himself to the defendants, but they would not receive it without the payment of what accrued before he entered.   There is a consent of Mr. Bowman, Sherman's attorney, endorsed on the complaint, that it might be filed, "*nunc pro tunc,*" as of December 11, 1855, and admission of service is ante-dated to that day.   This was well enough, so far as Sherman was concerned ; but when the question of diligence of the trustees arises, Mrs. Ellig can not be concluded by Mr. Bowman's "*nunc pro tunc*" stipulation.   The time had passed.   Jefferies had been for nine months receiving the rents, and no stipulation of Sherman could cure this negligence.   The complaint was not in fact filed till June, 1856.   The suit, if commenced on the "*nunc pro tunc*" day, 11th December, 1855, might have been tried long before the complaint was, in fact, filed.   But suppose it had been filed 11th of December, 1855.   Sherman had assigned more than three months before that, and the commencement and prosecution of this suit, is the sole answer to the plaintiff's charge of mismanagement of the trust estate.

4. The moneys advanced to Mrs. Ellig and her husband were not expended in the execution of the trust, and constituted no lien on the land, and no Court has any power to make that debt for money loaned at two or two-and-a-half per cent. interest, a specific lien on the land. The debt was the proper subject of an action at law against the persons respectively, to whom the money was loaned, and could not be adjusted in this suit; for, if not a lien on the property, the Court below has no power to decree its payment as a condition precedent to the surrender of the trust, on the ground that it had been abused. Neither could the $1,000 allowed to Mr. Sharp for prosecuting the $85,000 suit be made a lien.

5. That part of the decree is erroneous which adjudges that Mrs. Ellig pay in the first instance, the balance against John Ellig for advances made to him in his lifetime on account of his separate half of the rents, and his share of allowance to Mr. Sharp.

The plaintiffs respectfully submit that the portions of the decree herein claimed to be erroneous should be reversed, and such a decree made by this Court, as the case shows the parties entitled to. And particularly that it should declare and hold the defendants, or, at least, the defendant Naglee, liable for the rents from and after the month of November, 1854, either at the rate of $750 per month for the whole term to the commencement of this suit, or, at least, from that time to the thirtieth of August, 1855; and the rents actually realized by Jefferies after that time, $9,000, which might have been realized by the trustees if they had re-entered; crediting to the defendant Naglee the sums actually advanced by him to Mrs. Ellig, beyond his receipts; allowing him no interest, because he might have collected the money before the advances were made, but charging him interest from the several times when the rents ought to have been collected; and that the trustees be discharged, and the property be restored to Mrs. Ellig, free and clear from all claims and incumbrances in favor of, or created by the defendants, with such other provisions as shall seem proper.

It is especially desired that in passing on this appeal the Court declare and settle fully the rights of the parties, in order that the property may be relieved from the embarrassments in which the defendants have involved it.

*Halleck, Peachy & Billings, and Gregory Yale,* for Respondent Naglee.

Have the defendants been guilty of such negligence in the management of this trust estate, as to make them responsible for an uncertain sum, as alleged?

In the argument it was urged that the Judges of this Court would not have managed the trust estate in the same manner

that the trustees did; and if the Judges, with the lights before them, would not have done so, the trustees are to be measured by this criterion, and, if wanting, adjudged indiscreet and liable. In other words, a Court of Equity will, in such cases, require that a trustee should act with all the scrupulous circumspection, caution, and wisdom, with which the Court itself, from its long experience, and superior means of information, is accustomed to act; a doctrine certainly somewhat perilous to trustees, and startling to uninstructed minds. It is, to adopt the language of Lord Bacon, substituting for the private conscience of the trustee, "the general conscience of the realm, which is chancery." 2 Story's Eq., § 1273.

It is not easy, in a great variety of cases, to say what the precise duty of a trustee is. The cases in which his acts will be deemed violations of trust, for which he will be held responsible in equity, are difficult to be defined. § 1267. As he is supposed merely to take upon himself the trust as a matter of honor, conscience, friendship, or humanity; and as he is not entitled to any compensation for his services, at least not without some express or implied stipulation for that purpose, he would seem, upon the analogous principles applicable to bailments, bound only to good faith and reasonable diligence, and, as in case of a gratuitous bailee, liable only for gross negligence, although their acts are not always measured by such a rule. § 1268.

There is another general principle, as stated by Lord Hardwick, that the rules holding trustees to personal accountability should not be laid down with a stricness to strike terror into mankind, acting for the benefit of others and not for their own; and that as a trust is an office necessary in the concerns of man and man, and which, if faithfully discharged, is attended with no small degree of trouble and anxiety, it is an act of great kindness in any one to accept it. To add hazard or risk to that trouble, and to subject a trustee to losses which he could not foresee, and consequently not prevent, would be manifest hardship, and would be deterring any one from accepting so necessary an office. § 1271. The true result of the considerations here suggested, (§1272,) would seem to be that, where a trustee has acted with good faith in the exercise of a fair discretion, and in the same manner as he would ordinarily do in regard to his own property, he ought not to be held responsible for any losses accruing to the management of the trust property. This general rule is independent of some artificial rules, respecting particular matters, laid down by Courts of Equity, and not applicable to this case.

The general principle on which the liability, resulting from gross negligence, proceeds, is illustrated by the cases, a few of which only are necessary to be presented. In Tibbs v. Carpenter, 1 Madd. Rep., 166, there was a direction, by the testator, to

the executor, as to the disposition of the accumulated rents after the death of the testator's wife, should she survive him. She survived him eleven years. There were arrears of rent, as reported by the Master, of £1,500, due certain legatees. The question was, how far the executor should be held responsible. The Vice-Chancellor says, in his opinion, that the executors have "not produced any evidence in their exculpation; and I am under the necessity of deciding, in the absence of all evidence, on behalf of the executors." He says: "If, therefore, there be *crassa negligentia*, and a loss sustained by the estate, it falls upon the executors. Here, for want of evidence, I can not say that all this rent could not have been recovered; and I am reluctantly obliged to assume that no exculpating evidence could be produced, and, therefore, they must be charged with these arrears. Interest on the arrears was faintly asked for, and ought not to be given."

In Bruxton *v.* Bruxton, 1 Mylne & Craig, 80, an attempt was made, by some legatees, to fix a personal liability upon one of two executors, because he failed, when requested, to unite with the other executor in selling certain securities, Mexican bonds, at a period of the market when a higher price could have been obtained than the price realized when sold at a later period.

The opinion was delivered by Sir John Leach, Master of the Rolls, against the claim of the complainants. He says, very emphatically, "I can find no case, and none has been produced, in which an executor has been called upon to bear the loss that has arisen, because, in the *bona fide* exercise of a reasonable discretion, the conclusion he came to has turned out unfortunately." And this discretion, he says, can be exercised by each, independently of the other. Otherwise the effect would be to rest the whole discretion in one. "If a discretion rests with one of two executors, it must surely follow that the discretion can not be taken away by the other coming to a different conclusion. One is not bound to agree with the other. In case of a diversity of opinion, they can only resort to some higher authority which is competent to control them both."

He further remarks, in this case, respecting the case of Tibbs *v.* Carpenter, that, as reported, it is a very strong decision, and that there was considerable delay, and also circumstances amounting to *crassa negligentia*, on the part of the executors, showing that they took no trouble, and did not attempt to exercise any judgment as to when the money should be called in. Blue *v.* Marshall and Wife, 3 P. Wm., 381; Garrett *v.* Noble, 6 Simons, 516.

The general principle is stated by Sir L. Shadwell, Vice-Chancellor: "The rule of law is, that where trustees *bona fide* exert themselves to discharge their duty, and merely commit an error in judgment, unless there is a plain violation of trust, they

shall not be visited severely. The fair exercise of their judg-
ment is a protection to them, although the consequences may be
bad. Here, in the first instance, there was a difficulty, and they
set themselves to cope with it as well as they could."

The general rule, fixing the liability of the trustee, is stated
by Mr. Justice Woodbury, as the doctrine of the Supreme Court
of the United States. He will not be held accountable for more
money than he has actually received, except "in cases of very
supine negligence, or willful default." Taylor *v.* Benham, 5
How., 275.

The case of Garrett *v.* Noble is important, and in point in
another particular. If the party interested in the subject of the
bill was cognizant of the proceedings, and made no objection in
his lifetime, and did not complain of the acts of the trustees, his
representations after his death could not charge them with a
breach of trust. The Vice-Chancellor expressly holds this doc-
trine.

All the transactions complained of, in the case at bar, took
place in the lifetime of Ellig. He died in March, 1856, long after
the suit against Sherman had been commenced. The complain-
ant in this suit says that, until recently, that is, on the 25th of
October, 1856, when the bill was filed, she was satisfied with the
acts of the trustees.

The witness Gunnell says that he frequently conversed with
Ellig, and that he expressed himself "perfectly satisfied with
Messrs. Sharp and Naglee, and their management of the trust prop-
erty. He consulted me about taking the house off Sherman's
hands, and I told him I would not, but would hold Sherman on
the lease. He said he was perfectly satisfied, and would do so."

It may be said. by way of explanation, that, in fact, the exec-
utors of Ellig, though nominally parties to the complaint, are not
uniting with Mary Ellig to establish a breach of trust against
the defendants. The suit was commenced before the will was
probated, or letters testamentary granted. Amendments were
afterwards made, making Mudge one of the executors, by ap-
pointment in the will, and the present husband of the plaintiff,
who became executor by the joint operation of the will and the
marriage certificate.

The object of this was to have the estate represented in the
suit. The plaintiff did not sue in her capacity as executrix,
though she sets up an unprobated will, and claims as legatee un-
der it. If their representatives, now before the Court in that ca-
pacity, were urging the charges of a breach of trust against the
defendants, the doctrine of Garrett *v.* Noble, upon the last point,
would imply.

Judge Story lays down the same rule. Equity will not allow
the representatives of a *cestui que trust*, who has acquiesced in

the acts of the trustee, to proceed against him, upon the general maxim: *vigilantibus, non dormientibus, equitas subvenit.* § 1284.

The same principal is extended to the actual commission of a breach of trust, and the acquiescence of the *cestui que trust* after knowledge. "If, after the commission of a breach of trust, the trustees have given full and complete information to the *cestui que trust,* and they have acquiesced in the existing state of things, and have dealt with the trustees on the footing of that acquiescence, the breach of trust will be considered as waived." Adams' Eq., Am. ed., 1855, 62.

John Ellig not only acquiesced in, but actually approved of the conduct of the defendants in respect to the suit for $85,000. The plaintiff complains of the suit because the defendants were defeated. Why did she not complain at the institution of the suit, if that act amounted to a breach of trust? Or did she await the result, in order to judge by that? Would she have received the $85,000, had that sum been collected by that suit? It will not do to press the question. On the argument her counsel thought not—that the $750 per month was better.

Here, another elementary principle can be invoked. If a breach of trust has been committed, and all the *cestui que trusts* did not participate in it, the loss, before falling on the trustee, must first be made good out of the trust estate of the person who consented. Trafford *v.* Boehm, 3 Atk., 444.

The proof being clear that John Ellig participated in the alleged breach of trust, committed by suing for $85,000, the plaintiff must first look to his estate for the loss. She being the beneficiary, under the will, or upon the ceasing of the trust by John's death, she actually occupies the remarkable position of suing herself, while traducing her late husband's memory in attempting to recover.

Again, it is a rule that where it becomes necessary for a trustee to act by the hands of another, or where, according to the common usages of mankind, it should be done, he is not to be made responsible for his losses. 2 Sto. Eq., § 1269.

In this case, the defendants, when the difficulty respecting the rents occurred, consulted a respectable legal firm, of which Mr. Sharp was a member. They placed themselves, as respects their judgment, in the hands of Judge Aldrich and Mr. McDougall. They did not tell these legal gentlemen to pursue any particular course of action, or to institute any particular suit, but to act in the premises as was most proper for the interests of the Elligs. Had they been advised to make a particular demand for the surrender of the premises, which seems to be the great *desideratum* in their conduct, that advice would no doubt have been followed, or any other particular mode would have been adopted. But could the defendants have adopted a course of conduct in opposition to the one advised by their counsel? It

could then have been said, had the premises been demanded without a re-entry clause, instead of a suit on the covenant for the whole rent, that such a suit should have been brought, that counsel had advised it, and that the $85,000 was due by the bond— that they should in fact have demanded the pound of flesh.

Such a predicament would have been worse for the defendants than the present.

The rule establishing the protection of a trustee, in case of an error committed under professional advice, is recognized in England and America. Vez *v.* Emery, 5 Ves., 141; Thompson *v.* Brown, 4 John. Ch., 629.

Not a word escapes the plaintiff as to the unconscionableness of the bargain with Brown & Keyser. She is ready to reap all its benefits, and demands at the present day the $750 per month. These men should have been taken in charge by a Court of Chancery, when they were about to sign the lease, as *non compos mentis.* The only inequitable act perceptible by the defendants, consisted in obtaining this contract. Yet the plaintiff is not satisfied with exchanging the unimproved lot, through the medium of the trustees, for a lot "completely covered over" with three-story brick buildings, but refuses to give the defendants credit for so favorable a bargain. They should be entitled to the average result of their administration, at least—the good with the bad; but she wants them to pay the rent, also, of these fine buildings, now belonging to her, built up under their administration. And why? Not because they have got the money out of the property, but because a question of law arose out of the contract of demise, about which there was some difficulty in arriving at a certain solution; and the defendants, instead of determining the question themselves, were guided in their conduct by the advice of gentlemen whose profession it was to bestow it.

And this is the act of gross negligence for which they are liable! The first instance where parties were blamed for seeking counsel and following their advice in the discharge of a fiduciary duty, and perhaps the only instance where gross negligence was defined to consist of positive acts in aid and protection of an interest, instead of willful omissions concerning it.

No question is made about that portion of the decree authorizing the mode of collecting the sum admitted to be due the defendants.

BURNETT, J., delivered the opinion of the Court—FIELD, J., concurring.

The first point made by the plaintiffs' counsel is that the Chancellor erred in finding that the trustees had fairly discharged the trust.

It appears that Sherman entered under his assignment, on the fourth of April, 1855, and that defendants called upon him for

the first time in that month. This delay in calling upon Sherman was well accounted for, from the fact that the assignment to him was only intended as a mortgage to secure a loan of $5,000, and was unknown to the trustees until he entered to receive the rents in April. The rents due on the twelfth of November, December, January, February, and March—five months —had not been collected of Brown & Keyser, although they were then solvent. But this delay was justified by the fact that Brown & Keyser were then putting up permanent improvements upon the property, at a cost of some $35,000. These improvements were completed in April, 1855. This indulgence was no doubt given to the lessees to enable them to finish their improvements, and was a prudent and justifiable act on the part of the trustees. From April to October 1, 1855, there were some six months wasted in fruitless attempts to compromise with Sherman. There was a clause in the lease to the effect that if the rent remained unpaid for thirty days after due, then the rent for the whole unexpired portion of the term should become due and payable at once. It appears from the testimony of General McDougall, that about the first of October, 1855, the law firm of which he was a member, consulted about the lease, and the trustees were advised to bring a suit against Sherman for the entire rent of the remaining portion of the term, amounting to some $84,000. The complaint was not filed, however, until June 11, 1856, and the suit was determined in December, 1856, against the trustees. It is true, that by a stipulation of the attorneys, the complaint was filed *nunc pro tunc,* as of December, 1855; but this stipulation did not cure nor excuse the delay.

It is insisted, by the learned counsel of plaintiffs, that the bringing of the suit for $84,000 against Sherman was not a proper exercise of discretion, and that the delay in bringing the suit was unjustifiable, and the trustees should, therefore, be held responsible for all the losses occasioned by this mismanagement.

It is a general principle applicable to trustees, that when they act with good faith, and without any selfish motive, they are entitled to be treated by a Court of Equity with liberality and indulgence; and, especially, when they act under the advice of counsel. Trustees act for the benefit of others, and not for themselves, and the fair exercise of *their* judgments should be a protection to them. Very supine negligence, or willful default, will render them liable; but to make them liable for mere errors of judgment would tend to discourage good and prudent men from undertaking any trust. (Garrett *v.* Noble, 6 Simons, 516; Taylor *v.* Benham, 5 Haw., 285; Thompson *v.* Brown, 4 John. Ch. R., 629.)

The trustees were not to blame for bringing the suit against Sherman, as they did it with good motives, and under the advice of competent counsel. But the delay in bringing any suit to

settle the question, from April, 1855, to June, 1856, certainly did, *prima facie*, show supine negligence. It is, however, shown that John Ellig, just before his death, in March, 1856, approved of the conduct of the trustees, after being fairly and fully advised of all the circumstances. This acquiescence on the part of the *cestui que trusts* will excuse the trustees. (Garrett *v.* Noble— before cited ; 2 Story's E. J., § 1284; Adams' Eq., 62 ; Trafford *v.* Boehm, 3 Atk., 444.) Besides this acquiescence on the part of John Ellig, there were equitable circumstances that went far to excuse this delay. The trustees charged nothing for their services, and their administration of the trust estate, considered as a whole, was beneficial to the property and greatly increased its productive value. Upon the whole, we can see no error in this part of the decree.

The Chancellor decreed that the sum allowed the trustees was a lien upon the trust property, and that, if not discharged by the plaintiffs within thirty days, execution should issue, and the trust estate be sold to satisfy the same.

It is insisted by the counsel of plaintiffs that this portion of the decree was erroneous, for the reason that the advances made by Naglee were not expended upon the trust property, or for its benefit, and, therefore, constituted no lien upon the land; that they were mere personal loans from Naglee, for which no specific lien could be decreed by the Court, but for which Ellig and wife were personally liable in an action to recover the amounts.

We think this portion of the decree too harsh, under the circumstances of the case. It seems clear that Naglee made the advances, with the understanding that they should be repaid out of the incoming rents. It was only proper to give him a lien upon the net incoming rents, including those involved in the suit of the receiver against Sherman and others. The allowance to Sharp should be a lien only upon the rents, in the same manner as the allowance to Naglee. The net rents should be appropriated to the payment of the amount of the allowances until the same are paid.

The cause will be remanded, with directions to the Court below to modify the decree in accordance with this opinion. The appellants will be entitled to the costs upon appeal.